Polk v. The State.

## POLK v. THE STATE.

1. WITNESS—EXPERT: *When physician can testify as such.*
   A physician can not testify as an expert as to the effects of poison upon the system until it is first shown that he is qualified as such from study and experience in medicine. [For proper examination of an expert, see page 124.—REP.]

2. INSTRUCTIONS: *Should not assume facts nor be unintelligible.*
   Instructions which assume facts, instead of leaving the jury to find them, or which are too long, complicated and scientific to be easily intelligible to an ordinary jury, and not directed with sufficient precision to the facts in proof should not be given.

3. EVIDENCE: *Post mortem examination.*
   A *post mortem* examination is not necessary in all cases to convict for poisoning.

5. EVIDENCE—ACCOMPLICE: *No conviction on his uncorroborated evidence.*
   One who with full knowledge that a crime has been committed, conceals it from the magistrate or harbors and protects the criminal, is an accomplice; and a conviction of the principal can not be had upon his testimony unless it be corroborated by other evidence tending to connect the defendant with the commission of the crime; and the corroboration is not sufficient, if it merely shows that the offense has been committed and the circumstances of it.

APPEAL from *Howard* Circuit Court.
Hon. H. B. STUART, Circuit Judge.

*Hawes H. Coleman,* for appellant:

*Corpus delicti.* Proof must not only show death, but that it was criminally produced. *Wharton on Homicide,* 641. And without this proof, a confession will not sustain a conviction. *Ib.;* 43 *Miss.,* 472; *Wharton & Hill's note to pp.* 1115, 1119, 1121; *Gantt's Digest,* 1933; 26 *Miss.,* 157; 32 *ib.,* 433.

Failure of state to show contents of stomach by expert evidence, a culpable omission. *Ib.,* 1128.

Symptoms of deceased not necessarily result of poison. On this point, in connection with the evidence, cited *ib., note to p.* 625; *p.* 330.

Confessions should have been excluded. They were on a matter distinct from the charge.

### STATEMENT.

EAKIN, J. Appellant was convicted of murder in the first degree and sentenced to death, upon an indictment for poisoning his wife.

The evidence is, substantially, as follows:

Some time in the fall of 1878, appellant's wife died with symptoms which are described by the witnesses, many of whom were in attendance. She had been unwell the day before, but was doing better in the morning. Her husband and child were with her; and he had, himself, sent for a doctor, who left medicines to be taken. One dose had been administered, and she was left by her neighbors at noon, sitting up, and apparently doing well. During the afternoon the neighbors were called in again, and found her

much worse. She had spasms and convulsions, attended with cramps, frothing at the mouth, and throwing back of the head. She died about night-fall. One of the women present testified that she died with symptons like those of the witness's little granddaughter, who, the physicians said, had *meningitis.*

No suspicion seems to have attached to defendant at the time. He remained in the neighborhood for near eighteen months. About that time it seems a letter came from a woman at Arkadelphia, who had formerly lived in the neighborhood, named Mary Kidd; out of which there grew up a rumor that he had caused his wife's death by poison. Upon this he left the country and went to Tennessee, stopping one night with Mary Kidd, at Arkadelphia. It was well known that she had been having illicit intercourse with him, both before and after his marriage with his wife Adah.

Upon the trial, Mary Kidd testified that before his wife's death she had had a secret conversation with the defendant, in which he asked if strychnine would kill. She said it would, and arsenic, too. He said he had given Adah a dose, and it did not kill her. He then pulled some strychnine out of his pocket, in a paper, took some on the point of his knife, put it in whisky, and said he was going to give it to Adah; she testified also that defendant got some cakes from Mary Vaughan and put strychnine in them for Adah to eat, and, he said, she knocked it off. He said Adah was the " God damnedst hardest nigger to kill he ever saw ;" and told her of another occasion in which he had put poison in buttermilk for Adah, which she was prevented from taking. After Adah's death witness and defendant were talking together on the subject of his wife's poisoning, when she told him he would not have done that devilment if he had taken her advice. She then started to

tell Spencer Polk of it, who was in the field close by. Defendant knocked her down with a hoe, saying, "It is the way with a d—d long-tongued woman, she could never keep anything." Witness visited the defendant in jail and told him again that if he had taken her advice he would not be in that trouble, and he assented.

*Harrison Counts* had a conversation with defendant in the spring of 1880 about poisoning his wife, and about the letter of Mary Kidd from Arkadelphia. Defendant said Mary Kidd was as deep in it as he was.

There was proof also that Mary Vaughan had sent cakes to Adah, by defendant, shortly before her death; and that about six weeks or two months before that, defendant had obtained from Spencer Polk, strychnine to kill coons.

The bill of exceptions proceeds as follows:

"Dr. Jacob Curtis was then introduced, as an expert, who testified:

"The state here asked Dr. Curtis to tell the symptoms, in case of poisoning by strychnine. The defendant objected to him stating anything, only upon a hypothetical case; but the court permitted him to testify as to symptoms of poisoning by strychnine—to which ruling of the court the defendant excepted, at the time."

"Dr. Curtis testified: The symptons indicated show evidence of strychnine. Tetanic influence might produce similar symptoms—bitter taste; burning thirst; general languor; tonic rigidity of the muscles, which increase in severity until it amounts to spasms. Strong cramping of the superior part of the larynx; breathings suspended after paroxysms; mind clear, confined to spinal system of nerves; mind generally undisturbed; spasms continue until death. Tetanic, with a throwing back of the neck; general rigidity, which continues until some time after

Polk v. The State.

death; dilating influence on animals; can't say as to human beings."

CROSS-EXAMINED.

" Difficulty with throat and breathing, only during spasms, described as of the order of tetanus, which generally represents the symptoms in strychnine. Premonitory symptoms in tetanus, very difficult to describe, as differing from poison. In tetanus the convulsions are longer. The symptoms, as far as I heard them, and I heard all of them, are very meager, and make it difficult to distinguish between poison, in this case, and tetanus. The symptoms, as indicated, showed effects of poison, but may arise from other çauses. The symptoms spoken of, on night before, militate against poison by strychnine. "

The defendant moved to exclude so much of this testimony as tended to establish symptoms of poison, on the ground that the state had failed to show that said symptoms might not have resulted from disease instead of poison by strychnine. The motion was overruled.

There was nothing important developed by the testimony on the part of the defendant, except that the character of Mary Kidd, for veracity, was impeached by many witnesses, who swore that from her general reputation they would not believe her upon oath.

Amongst other instructions given for the state, the following was given against the defendant's objections, as the third:

" In arriving at a verdict in this case, the jury may take into consideration all the facts and circumstances proven; and, in ascertaining whether or not the deceased came to her death by poisoning, they may take into consideration the circumstances of the death of the deceased, the symptoms attending her sickness, the *declarations of the de-*

*fendant made before the decease*, and his confessions, if any, made after the death ; *his efforts to suppress testimony ; his possession of the poison shortly before the death ;* his motives, if any, and *his flight ;* and if, after a careful consideration of all the facts and circumstances of the case, the jury are satisfied, beyond a reasonable doubt, of the guilt of the defendant, it is their duty to convict. "

Amongst instructions asked for defendant, the following were refused, and he excepted :

" 7. All the importance of the evidence, derived from the symptoms, depends upon the possibility of showing a distinction between them and a disease suddenly developed. This distinction should be sufficient, not merely to satisfy the mind of the physician, but to afford convincing proof to the jury. It can rarely, with perfect conscientiousness, be asserted that the symptoms might not be explained upon the supposition of disease. Hence, this portion of the medical evidence can not stand alone, but must be supported either by the positive correspondence with it, of the *post mortem* appearances and chemical analysis, or by the absence of any evidence, autopsy, or viewing the corpse of the deceased, confirming that notion of disease. Thus, in suspected poisoning by strychnine, the convulsions caused by this alkaloid, might be readily and plausibly ascribed to other external or internal causes. Upon the symptoms alone, it would be impossible to base evidence sufficiently strong to procure a conviction, and if the jury find from the evidence that the state has failed to prove by positive evidence, by the *post mortem* appearances and chemical analysis, or by the absence of any evidence from the autopsy, confirming the notion of disease, they are instructed to acquit."

" 9. If the jury believe, from the evidence, that the witness, Mary Kidd, after the commission of the crime

charged, and with a full knowledge that said crime had been committed, concealed it from the magistrate, or harbored and protected the defendant, they will find that she is an accomplice, and that a conviction can not be had upon her testimony, unless they further find that her testimony is corroborated by other evidence tending to connect the defendant with the commission of said crime; and the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof; and if the jury so find they may acquit."

In the motion for a new trial, it was objected:

That the court had erred in allowing Dr. Curtis, after having heard all the testimony, to give, generally, his opinion concerning the effects of strychnine, instead of presenting a hypothetical case upon the evidence, and asking his opinion as to that.

Also, that the court had erred in giving the third instruction asked by the State, and in refusing the seventh and ninth instructions asked by the defendant.

There were other grounds, not important to be noticed.

### OPINION.

First, as to the testimony of Dr. Curtis, although it is stated in the bill of exceptions that he was introduced and testified *as an expert*, yet it is not shown that he was a practicing physician, or had any peculiar means of knowledge, from study or experience, to constitute him such.

1. WITNESS —EXPERT: When physician can testify as such.

Doubtless he was well known to the court, jury and attorneys, as a physician of high standing, but we can not presume that.

He says he heard all the symptoms, but does not say when, where or from whom; that they are very meager, and make it difficult to distinguish between poison in this case

Polk v. The State.

and tetanus; that the symptoms, *as indicated*, showed effects of poison, etc.

All this was irregular and incompetent. It should have been first shown that Dr. Curtis was qualified to speak as an expert, from study and experience in medicine. It would not have been objectionable, then, to have asked him to describe, generally, the symptoms of strychnine, in the human system, because these are facts of science, depending upon the course of nature, although coming seldom under the observation of others than experts in medicine. And if it had stopped there, it would have been competent to the jury, to have compared the symptoms testified to by witnesses with those given by the expert, as to the usual effects of strychnine, as affording *some* tendency to prove the manner of the death. But, although not erroneous, such a course of examination is eminently unsatisfactory and liable to mislead. The proper course is to take the opinion of the expert upon the facts given in evidence, not as to the merits of the case, or the guilt or innocence of the prisoner, but as to the cause of the death, so that the jury may first determine whether any crime has been committed by any one at all. If the expert has been present, and heard all the evidence as to the symptoms and appearances, detailed upon the trial, he may give his opinions upon the facts so stated, *if they be found true by the jury*, but can not, himself, judge of their truth. If he has not been present and heard them they may be repeated to him, in the presence of the court and jury, and his opinion concerning them required upon the same supposition of their truth. But, in either case, the opinion is upon a hypothetical state of affairs, and its value depends upon the view *the jury* may take of the truth of the facts, to which witnesses have sworn. It can not be based upon any facts which the expert may have heard outside, and may believe

Examination of medical expert.

to be credible; and, if based upon his own knowledge of particular facts, he should, himself, detail the facts, and give his opinion thereon. Tested by these rules, it will be seen at once that the whole testimony of Dr. Curtis should have been taken from the consideration of the jury, except so much as gave the general symptoms of poisoning by strychnine; and that portion, standing alone, and being itself of little value, might well have been excluded with the rest. It is always to be borne in mind that the general rules of evidence exclude all opinions, whatever, and that the testimony of experts is exceptional, and must be carefully confined within its true and rational limits. In the case here now in judgment, we can have little doubt that Dr. Curtis *did* hear all the testimony given upon the trial, and gave his opinion upon its hypothetical truth. It is conceded in the motion for a new trial, but we can not notice the facts stated in a motion for a new trial, and not shown otherwise by the bill of exceptions, and upon the record of this cause we must hold that there was error, as indicated.

In the third instruction given for the state, it is plainly assumed, in the expressions I have italicised, that the defendant had made declarations before the death of his wife, and efforts to suppress testimony afterwards; that he was in possession of poison shortly before the death of his wife, and that he afterward fled. These expressions should have been qualified by the condition that they be found true, by the jury, which might not have found the testimony on those points worthy of credit.

2. INSTRUCTIONS: Should not assume facts,

" Judges shall not charge juries with regard to matters of fact, but shall declare the law." *Const.*, *Art. VII*, *sec. 23*.

The seventh instruction, asked by defendant, was properly refused. It was too long, complicated and scientific, to be easily intelligible by an ordinary jury, and not direct-

Nor be unintelligible

Polk v. The State.

ed with sufficient precision to the facts in proof. There never had been any pretense to any chemical analysis or autopsy in this case. It is not true that either is necessary to a conviction for poisoning in all cases, and the allusion to them tended to confuse.

*3. Post mortem examination for poison not necessary in all cases.*

In forming the ninth instruction, the defendant's counsel adopted the language of the Code, defining accessories after the fact, and regulating the testimony of accomplices. Gantt's Digest, sec. 1239, declares every one an accessory after the fact, " who, after a full knowledge that a crime has been committed, conceals it from the magistrate, or harbors and protects the person charged with or found guilty of the crime."

*4. Accomplice. Who is.*

An " accomplice," in the full and generally accepted legal signification of the word, is one who, in any manner, participates in the criminality of an act, whether he is considered, in strict legal propriety, as a principal in the first or second degree, or merely as an accessory before or after the fact. *Russell on Crimes, p. 26.*

*5. ———: No conviction on his evidence unless corroborated.*

Section 1932 of Gantt's Digest, regulates the force and effect of the testimony of accomplices, as requested in the instruction. There was evidence tending to show that Mary Kidd was an *accomplice*, and that fact, together with the consideration as to whether her testimony was properly corroborated, should have been left with the jury. It was error to refuse the instruction.

We deem it proper to remark that, whilst in view of the worthless character for veracity of the principal witness; her improper connection with the defendant; the apparent room for doubt as to the real cause of the death; the vague nature of the confessions; the want of any *post mortem* examination, and other circumstances, our minds are not satisfied with the verdict of conviction, yet we would not, on the grounds of such mere dissatisfaction, overrule the

circuit judge in refusing a new trial. The rule, to abide by verdicts rendered upon legal evidence, and which seem to be the result of the calm and unbiased judgment of juries, without erroneous instructions of the court of malconduct of the jurors, and when the presiding judge is satisfied, is a rational one, and to be rationally followed.

Yet, for error in admitting the testimony of Dr. Curtis; in giving the third instruction for the state, and in refusing the ninth, asked by defendant, the judgment must be reversed and a new trial awarded.

Judgment accordingly.