Kate Marie SARGENT *v.* STATE of Arkansas

CR 80-235                                             614 S.W. 2d 507

Supreme Court of Arkansas
Opinion delivered April 27, 1981

*E. Alvin Schay*, State Appellate Defender, by: *Deborah Davies Cross*, Deputy Appellate Defender; and *Harold Hall*, for appellant.

*Steve Clark*, Atty. Gen., by: *Theodore Holder*, Asst. Atty. Gen., for appellee.

STEELE HAYS, Justice. Following the shooting death of Charlie Frank Sargent on February 18, 1980, first degree murder charges were filed against Sargent's wife, Kate Marie Sargent, and three sons, Donald, seventeen, Cecil, fifteen, and Roy, fourteen. Immunity was granted to Cecil and Roy in exchange for their agreement to testify in the separate trials of Kate Marie Sargent and Donald.

Kate Marie Sargent was convicted of second degree murder and sentenced to 20 years and a fine of $15,000. She appeals on the single point that there is insufficient corroborating evidence of the accomplices, Cecil and Roy, to sustain her conviction. We find the corroboration to be sufficient.

The evidence against appellant consists primarily of the testimony of Cecil and Roy, accomplices in the crime, and the introduction of a statement voluntarily given by appellant after being informed of her rights, which implicates her in the crime while denying her guilt. The evidence establishes these events: In the early morning hours of February 19, 1980, the body of Charlie Frank Sargent was found along a remote stretch of Woodson Lateral Road in Saline County. His pickup truck was parked beside the road, the passenger door open, and the body, entangled in vines, was lying some 15 feet below in a ravine. Death was attributed to four bullet wounds from a small caliber weapon, the fatal wound being just above the heart. Sargent's clothing and the truck had a strong odor of kerosene and an effort to burn the truck was evident.

Sargent's wife and sons at first informed the police that Charlie Sargent had left home in the truck on the evening of

February 18 following an argument with Mrs. Sargent and had not returned. Later, however, they gave statements which agreed in substance that Donald had planned the crime, fired the shots that killed his father and that all four had participated in the efforts to conceal the crime. Stating the facts most favorably to the State, on the evening of February 18, Donald got home around 6 p.m., shortly after his father arrived. As the family was having supper and watching television, Donald left the living room-kitchen area and went to his mother's bedroom where he obtained a .22 caliber pistol. He returned to the living room and sat down behind his father. He fired one shot from the pistol toward his father which missed. Charlie Sargent got up and moved toward Donald, asking what he was doing with the pistol. Donald then fired four or five more times, four of the bullets striking Charlie Sargent. As Sargent lay on the floor calling for help, Mrs. Sargent made attempts to cover him with a blanket and to call an ambulance, which Donald prevented by hanging up the telephone. Mrs. Sargent, Cecil and Donald managed to get Sargent into the truck, which Donald drove ahead as Mrs. Sargent, Cecil and Roy followed in the other family vehicle, a Gremlin. In the Gremlin on the seat were two gallon milk cartons filled with gasoline or kerosene which Kate Sargent had bought the day before. Also, Cecil brought to the car a bomb fashioned from a glass beer bottle filled with gasoline with a cotton wick inserted at the top.

Donald drove east on Woodson Lateral Road some three miles to the point where the truck and body were found. According to Roy's testimony, Donald, Cecil and Mrs. Sargent tried unsuccessfully to push the truck into the ravine. Mrs. Sargent's statement refutes this in that she maintains she only observed the proceedings from the car. Donald and Cecil poured the kerosene on Charlie Sargent and in the interior of the truck cab. Sargent managed to get out of the truck several times and Donald struggled with him to keep him in the truck, striking him once with his fist. Donald took the "bomb" from Cecil, lit the fuse and threw it at the truck, which burst into flames behind the cab. Mrs. Sargent and the boys then got into the Gremlin and drove home "to wait and see" what developed. All acknowledge

that Charlie was alive and conscious when they left, Cecil noting that he got out of the truck and fell into the ravine as they drove away. When the truck was found the next day, only the spare tire had burned as a result of the fire.

Ark. Stat. Ann. § 43-2116 (Repl. 1977) provides in pertinent part:

A conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof.

As we stated in *Anderson* v. *State*, 256 Ark. 912, 511 S.W. 2d 151 (1974):

The test of the sufficiency of corroboration of the testimony of an accomplice is whether there is other evidence tending to connect the defendant with the commission of the offense which goes beyond a showing that the crime was committed and the circumstances thereof. The corroborating evidence need not be sufficient in and of itself to sustain a conviction, but it need only, independently of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the crime. *Anderson*, at 915.

See also, *Bly* v. *State*, 267 Ark. 613, 593 S.W. 2d 450 (1980). We have also held that the declarations of an accused before or after the crime may furnish the necessary corroboration of the testimony of an accomplice. Here, that corroboration is found in the testimony of the appellant. *Olles and Anderson* v. *State*, 260 Ark. 571, 542 S.W. 2d 755 (1976).

In this case, a number of circumstances are present which not only tend to connect appellant with the crime, but which provide a convincing network from which the jury could fairly infer her active participation in the homicide. Kate Marie Sargent's account of the homicide to the investigating officers conflicts with the testimony of Cecil and Roy

and is riddled with self-contradictions, the more notable being: she first said that she and Charlie argued over the checkbook and Donald was protecting her, later abandoning this version; she first denied that she removed his billfold after the shooting, then admitted it; she first told the officers she had no knowledge of the whereabouts of the murder weapon, then directed them to its exact location; she first denied being in the room when the shooting occurred and then admitted seeing the shots fired; she first denied any part in the "cover-up" stories, then admitted her participation. Significantly, she admitted that the day before the shooting she bought the kerosene or gasoline to burn the pickup truck; though by her version she remained in the car while the truck was being set afire, Roy testified that she, Donald and Cecil tried to push the truck into the ravine; and lastly, part of her account of the event, though self-contradictory, reveals quite clearly that she had prior knowledge of Donald's plan to shoot and burn his father, which casts a most incriminating light on her participation in these incredible events:

Q: But the death had been planned before this, is that right?

A: Yes.

Q: Had you heard your son talk about this was going to happen, that he was going to kill his father and then burn him?

A: I begged him not to.

Q: But this was before he shot him? Did you hear this before then?

A: No.

Q: Just a minute ago —

A: Yeah.

Q: You said you had, you heard it planned.

A: The only way he talked about it . . .

Q: Was this the way he talked about doing it?

A: Yes.

Q: This is the exact way he talked about it before his father's death?

A: Yes.

Q: Okay, Mrs. Sargent, you were interrupted a few minutes ago, I couldn't hear you on the tape. You're saying that you did understand that Donald had planned this, to kill his father by shooting him and then to burn his body, is that right?

A: Yes.

Her assertions that she begged Donald not to go through with the grisly plan have a hollow ring when one considers that she did absolutely nothing to prevent it — she did not tell Charlie Sargent, nor the police, nor did she even destroy or hide the pistol. In fact, it was she who bought the pistol not long before the murder. Her assertions that she thought Donald was taking his father to the hospital are equally implausible when one considers that the two milk cartons of kerosene were, according to the boys' statement, on the seat of the Gremlin which she drove to the death scene and the fact that Cecil, who rode with her, brought the gas bomb from the house. Lastly, Roy's testimony that Donald, Cecil and his mother tried to push the truck into the ravine belie the protestations of innocence. Perhaps the crowning circumstance in this tragic saga of one man's family is the fact that a week or ten days after the murder and before suspicion had centered on the Sargents, Kate Marie Sargent purchased an automobile for Donald.

Much is made of Kate Sargent's efforts to cover her husband as he lay wounded on the floor crying for help and of her attempts to call an ambulance. What lay behind her paradoxical behavior in this regard cannot be fathomed.

Whether her efforts were self-serving, should the plan go awry as it did, or were motivated by regret or sympathy need not be scrutinized. It is enough that a strong chain of circumstance encircles the appellant sufficient to sustain the verdict of guilt, especially when viewed most favorably to the State, giving the evidence every reasonable inference the law requires. *Tatum* v. *State*, 266 Ark. 506, 585 S.W. 2d 957 (1979); *Core* v. *State*, 265 Ark. 409, 518 S.W. 2d 581 (1979).

We are convinced that circumstantial connections to the crime and the appellant's own statement go "beyond a showing that the crime was committed and the circumstances thereof." *Anderson*, above. The defendant's own admissions plainly "connect the defendant with the commission of the offense." *Anderson*.

We find sufficient corroboration of the testimony of the accomplices to sustain the conviction. *Anderson* v. *State* and *Bly* v. *State, supra*.

Affirmed.

PURTLE, J., dissents.

HOLT, J., not participating.

JOHN I. PURTLE, Justice, dissenting. I strongly dissent in this case. There is absolutely no evidence to support a verdict finding the appellant guilty of second degree murder or any crime of a higher degree. I concede the evidence shows she is probably guilty of hindering.

The three sons of decedent and appellant all testified and made numerous statements to the officers prior to the trial. However, not one word in any of their testimony states or even alleges that appellant was in on the planning or indeed had any knowledge that this crime was to be committed.

The majority base the opinion on matters which are all after the fact. For example, the big act which they used to connect this woman to the murder of her husband is the fact

that she took her husband's billfold from his pocket after he had been shot. I do not know of a wife who would not take her husband's billfold from his pocket when he was being sent to the hospital. Appellant did state that she thought they were taking her husband to the hospital when they left their home. Also, they make much of the fact that she had bought a gallon of gasoline which was sitting in the back of the pickup truck, and had purchased a pistol, which was kept in the house. It does not take a very smart person to know that gasoline is used in lawn mowers and other small internal combustible engines and for many other purposes around a home. It is not unusual to find gasoline in plastic containers around most any residence. Most homes have handguns and rifles in them at the present time, and this is neither a crime nor evidence of a crime. The majority even takes into consideration the fact that she helped make up a story after the murder to keep the officials from finding out that her son had killed her husband.

Let us look at what really happened. Without any prior knowledge to any other members of the family, Donald Sargent obtained the family pistol from a bedroom and shot his father several times. The pistol had been kept in different parts of the house prior to this date. The appellant was in the kitchen at the time the shooting started and she arrived in the living room in time to see Donald shoot her husband at least twice, each time stating, "This is for Connie." She then tried to cover her husband up, but Donald would not let her. She tried to call an ambulance, and Donald would not let her. Every time she tried to help Donald stopped her.

The testimony clearly indicates that all of the family cooperated in putting her husband in the pickup truck. However, all of them but Donald seemed to think they were going to take the wounded man to the hospital in Benton. Appellant and her other two sons followed the pickup when it left the residence with Donald and his father in the cab. Apparently appellant and her two other sons were surprised when Donald made a right turn on the Woodson Lateral Road to go away from Benton instead of toward Benton. They followed him until he crossed Highway 167 at which time he drove out of view. However, shortly they came upon

Donald at a place where he had parked the pickup truck with his father in it. The appellant was asked the following question:

> Question: So what happened when you pulled up and saw Donald?

> Answer: I started crying and I said let's take him to the hospital and he said no, mama, we ain't going to do it.

All testimony indicates that Donald poured some gasoline on his father and attempted to set the truck on fire. This was done by throwing a fire bomb into the bed of the pickup truck. The only damage was to the spare tire which was in the back. When the appellant was giving her statement to the officers prior to the trial, she clearly stated:

> I did not have any idea that this was going to happen.

She further stated:

> I kept trying to put covers on him. Donald kept jerking them off. I kept trying to call an ambulance. Donald wouldn't let me. Donald said he would do me the same way. Donald did not say he would kill me, but he said that he would hit me. He did say he'd do the same thing to me. I was afraid for my life. When he said that it made me think that he was going to shoot me too if I didn't do what he said. *** I took the wallet off of him when we took him out to the truck so I could have some identification and he said he'd take him in and I could follow him in to the hospital.

The strongest evidence which the majority quotes concerns a series of questions which are set out in the opinion. I call your attention to the final question and answer of the confusing sequence:

> Question: But this was before he shot him? Did you hear this before then?

> Answer: No.

It is relatively easy for an intelligent educated attorney to put words into the mouth of an illiterate scared defendant who is on trial for his life. The appellant stated that she understood that Donald had planned to kill his father by shooting him and burning his body; however, she stated that she did not learn this until after it was done.

There was as much evidence to prove that Peter, James and John crucified Christ as there is that the appellant murdered her husband. The disciples followed afar off and observed all that was done but somehow we never have accused them of crucifying Jesus. This case is so weak that even the state admits that the testimony, if taken at face value, did not make out a case of an accomplice so far as the appellant is concerned. In other words, you have to resort to conjecture and speculation in order to affirm this decision.

In order to support a conviction the corroborating testimony of an accomplice must be such as to connect the defendant with the commission of the offense and if the testimony merely shows the offense was committed and the circumstances thereof, it is not enough. *Polk* v. *State*, 36 Ark. 117 (1880). Testimony of an accomplice which merely raises a suspicion and is as consistent with the innocence as the guilt of the accused is insufficient to sustain a conviction. We have reversed a conviction where the evidence, aside from the testimony of the accomplice, showed that the crime had been committed but raised only suspicion that the defendant was the guilty party. *Pollard* v. *State*, 264 Ark. 753, 574 S.W. 2d 656 (1978).

In view of the fact that I find absolutely no evidence to support a conviction of second degree murder, I would reduce the conviction to that of hindering apprehension or prosecution pursuant to Ark. Stat. Ann. § 41-2805 (1977).